## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CARTESSA AESTHETICS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-22-00454-PRW |
| | ) | |
| ED LORENTS, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER

Before the Court are (1) the Motion for Summary Judgment (Dkt. 29), filed by Defendant Ed Lorents and the response (Dkt. 33), filed by Plaintiff Cartessa Aesthetics, LLC; and (2) Cartessa's Motion for Summary Judgment (Dkt. 34), Lorents's response (Dkt. 42), and Cartessa's reply (Dkt. 49). For the reasons given below, the motions are **DENIED**.

### *Background*

This is a breach of contract action. Cartessa is a New York LLC that sells medical equipment. Lorents is a dentist in Oklahoma. On or about December 6, 2021, Cartessa's CEO, Gabe Lubin called Lorents and offered to sell him several pieces of medical spa equipment (the "Equipment") for a purchase price of $295,000.00. Soon after, Cartessa sales agent Tom Swapp had several conversations with Lorents (mostly over text message), discussing the possibility of selling him the Equipment.

The next day, Lorents texted Swapp and said that if he could obtain favorable financing terms, he would "try to make it happen." (Dkt. 29-3, at 1). In the same message, Lorents said that he (1) had low cash flow due to other large investments that he had made, (2) thought that $250,000.00 was a better price for the Equipment, and (3) was interested in "work[ing] something out in the future" if he could obtain a Tulsa office. (Dkt. 29-3, at 1). Swapp replied that he "told [Lubin] to just make it happen." (*Id.*). Swapp then asked if he could "send [Lorents a] quote so [Cartessa] can generate [a] proforma invoice for your financing guy?" (*Id.*). Lorents agreed, and Swapp sent him eight documents, four titled "Customer Purchase Agreement," and four titled "Cartessa Terms and Conditions of Sale" (collectively the "Documents"). (Dkt. 29-4, at 1–8).

The Documents contemplated the sale of the Equipment for a total purchase price of $295,000.00. Lorents signed them on December 9, 2021. The next day, Cartessa entered the signed Documents into its system as purchases and directed that the Equipment be shipped to Lorents. (Dkt. 29-6).

Meanwhile, Swapp and Lorents continued to text and email back and forth regarding financing details. On December 15, Swapp emailed Lorents to inform him that Swapp was "pretty sure" that Lorents had been approved for financing, but Swapp wanted to "look at the details to make sure it's a good deal [with] no 'gotcha-clauses.'" (Dkt. 29-7). Swapp asked Lorents to speak that Friday (December 17) to try to "get that all wrapped up if all looks good[.]" (*Id.*). Lorents responded the next day that he "would like to look at the financing and see what terms [he] could get." (*Id.*). Later that night, Swapp emailed Lorents

again to tell him that he had been "fully approved," but Swapp wanted to improve about half of the terms of the financing approval. (Dkt. 29-8).

On December 20, Swapp texted Lorents, asking for three months of business bank statements in order to obtain better financing terms. (Dkt. 29-9). Later that same day, Lubin approved the Equipment for shipment "based on full approval and loan [documents] out" and asked Swapp to work with Lorents "to ensure the loan [documents] are signed imminently." (Dkt. 29-10). Even though Lorents did not send the bank statements that Swapp requested (*see* Dkt. 29-9), Cartessa shipped Lorents four pieces of the Equipment. (Dkt. 34-1, at ¶ 19). Lorents received two of them on December 27, 2022 (Dkt. 34-1, at 90), and on the same day, he promptly requested that Cartessa cease delivering the Equipment, as the parties "had not finalized financing just yet." (Dkt. 29-13). Swapp explained in an internal email that because half of the financing approval "was not ideal[,] Dr. Lorents just wants a clear picture of financing before delivery." (Dkt. 29-15). Cartessa did not schedule any more deliveries, and it held the other two shipped pieces of the Equipment locally. (*See* Dkts. 29-11; 29-21).

On December 28, Lorents told Swapp that he was overloaded with work, that the deal was "too much for [him] right now[,]" and that any deal would "have to wait [until] next year[.]" (Dkt. 29-16). Swapp responded to determine if Lorents would be interested in financing with 5.9% interest, principal-only payoff, and deferred payments. (*Id.*). Lorents expressed that he could possibly make it work if the financing included a 6-month deferral. (*Id.*). Cartessa sent Lorents a credit application, but Lorents again expressed hesitation, texting Swapp that he was worried that he was overextended in his investments

and that he wanted to "see [his] bottom line and what [he could] afford . . . and go from there[.]" (Dkt. 29-17). Swapp replied: "100% man. We can fully examine what it looks like." (*Id.*). On December 30, Swapp texted Lorents to inform him of new financing terms, which Lorents apparently rejected at some point. (Dkts. 29, at 13; 29-18). But Swapp continued to work with Lubin to try to obtain financing terms acceptable to Lorents.

On February 8, 2022, Lorents texted Swapp to tell him that he could not do the deal at the time because "he had too many projects that need attention[.]" (Dkt. 29-20). Swapp responded to express his understanding of Lorents' position, but told Lorents that they would need to talk to Lubin about it. (*Id.*). Cartessa continued to hold off on delivery pending Lorents signing a financing agreement. (Dkt. 29-21).

On March 16, 2024, Lubin texted Lorents another financing proposal, and said that the deal could not be cancelled. (Dkt. 29-22). Lorents responded that he understood his and Cartessa's communications to be preliminary negotiations, and that any agreement was contingent on financing, finalization of the total price, and his securing a new office location. Lubin replied that he agreed that the agreement was subject to financing approval, but because Cartessa had secured financing, the agreement was binding. As to the other contingencies that Lorents understood to be prerequisites to the agreement, Lubin maintained that pricing had been finalized, and that the parties "never discussed the new location being a contingency to the deal." (*Id.*).

Lorents maintains that he never entered into a contract with Cartessa, so he never tendered any payment. Cartessa, on the other hand, argues that the parties did enter into a contract when Lorents executed the Documents. Thus, it argues that Lorents breached by

failing to immediately tender the purchase price. On June 3, 2022, Cartessa sued Lorents for breach of contract. (Dkt. 1). On June 27, 2022, Lorents filed a counterclaim for fraud in the inducement. (Dkt. 12). Both parties now move for summary judgment.

### Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] A genuine issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[2] Evidence that is "merely colorable" or "not significantly probative" will not defeat a motion for summary judgment.[3] A fact is material if it "might affect the outcome of the suit under the governing law."[4]

The moving party bears the initial burden of showing beyond a reasonable doubt the absence of a genuine issue of material fact.[5] Once the movant has met his initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[6] Courts may only consider admissible evidence in reviewing summary judgment, but the evidence need not be submitted "in a form that would be

---

[1] Fed. R. Civ. P. 56(a).

[2] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citation omitted).

[3] *Id.* at 249–50 (citation omitted).

[4] *Id.* at 248.

[5] *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002) (citation omitted).

[6] *Anderson*, 477 U.S. at 256

admissible at trial."[7] Rather, the proponent must merely show that the evidence is capable of presentation in an admissible form.[8] Courts must view all facts and reasonable inferences in the light most favorable to the nonmovant.[9]

### Analysis

Both parties move for summary judgment on Cartessa's claim for breach of contract. Additionally, Lorents argues that the Court should limit Cartessa's damages as a matter of law, and Cartessa seeks summary judgment on Lorents's affirmative defenses and his counterclaim for fraud in the inducement. But genuine issues of material fact preclude the entry of summary judgment as to the breach of contract claim and Cartessa's purported damages, rendering a ruling on Lorents's affirmative defenses and counterclaim premature.

## I.    Summary judgment is inappropriate as to Cartessa's breach of contract claim.

Lorents argues that the record demonstrates that the parties never reached a meeting of the minds as to form a contract. Cartessa, on the other hand, maintains that Lorents accepted Cartessa's offer when he signed the Documents.

### A.    Because Cartessa did not show that Oklahoma law conflicts with New York law, the Court applies Oklahoma law.

The Court must first determine what law applies. Cartessa argues that New York law applies under the Terms and Conditions of Sale. Lorents does not explicitly address this, but instead notes the uniformity of the Uniform Commercial Code (which is applicable

---

[7] *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (internal quotation marks omitted) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).

[8] *Id.* (citations omitted).

[9] *Anderson*, 477 U.S. at 255.

here, as discussed below) and cites to various jurisdictions, including Oklahoma and New York.

Lorents's primary argument is that he never intended to enter into an agreement with Cartessa, so the parties never formed a binding contract in the first place. Thus, reflexively applying "the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established."[10] To do so would be "inherent[ly]" and "logical[ly] flaw[ed.]"[11] Instead, the Court must first resolve the threshold issue of whether those terms and conditions of sale constitute part of a valid agreement between the parties. And before it can do that, the Court must decide which state's law applies to the issue of contract formation.[12]

Federal courts sitting in diversity apply the substantive law of the forum state, including the forum state's choice and conflicts of law rules.[13] Here, the forum state is Oklahoma. Oklahoma Courts assume that Oklahoma law governs, unless a party asserting that a different law applies carries its "burden of identifying and invoking" another state's law.[14] Said party must plead and prove that an actual conflict between the bodies of law

---

[10] *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012) (first citing *Trans–Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1124 (9th Cir. 2008); and then citing *B-S Steel of Kan., Inc. v. Tex. Indus., Inc.*, 439 F.3d 653, 661 n.9 (10th Cir. 2006)).

[11] *B-S Steel of Kan.*, 439 F.3d at 661 n.9.

[12] *See Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1006 (N.D. Ill. 2017) (collecting cases).

[13] *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir.1994); *Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166, 1178 (10th Cir. 2009).

[14] *Lewis v. Sac & Fox Tribe of Okla. Hous. Auth.*, 896 P.2d 503, 513 (Okla. 1994).

exists.[15] Thus, unless the "threshold question" of whether there is a true conflict is answered in the affirmative, the Court need not engage in a choice-of-law analysis.[16] Where two bodies of law do not conflict, the result is deemed a "'false conflict' or no conflict at all, and no choice of law analysis need be made."[17]

Both Oklahoma and New York have adopted the UCC. Cartessa has made no effort to demonstrate that an actual conflict of law exists between Oklahoma and New York law. Thus, the Court assumes that they do not conflict and applies Oklahoma law. In any event, the Court finds it would reach the same result under New York law.

### B.    The UCC governs.

To recover for breach of contract, Cartessa must first prove by a preponderance of the evidence that an agreement existed between it and Lorents.[18] Oklahoma has adopted the UCC, which applies to "transactions in goods."[19] A "good" generally includes "all

---

[15] *Ky. Bluegrass Contracting, LLC v. Cincinnati Ins. Co.*, 363 P.3d 1270, 1274, 1275 (Okla. Civ. App. 2015) (quoting *C.I.T. Corp. v. Edwards*, 418 P.2d 685, 688 (Okla. 1966)); *Rogers v. Dell Computer Corp.*, 138 P.3d 826, 831 (Okla. 2005) (where neither party argued that there was "any difference in the applicable law of Texas or Oklahoma . . . any perceived choice of law issue is contrived").

[16] *Poinsett v. Life Ins. Co. of N. Am.*, No. CIV-21-1205-F, 2022 WL 4361826, at *2 (W.D. Okla. Sept. 20, 2022) (quoting *Ky. Bluegrass*, 363 P.3d 1270, 1274); *Nat'l Cas. Co. v. W. Express*, 356 F. Supp. 3d 1288, 1294 (W.D. Okla. 2018).

[17] *Ky. Bluegrass*, 363 P.3d 1270, 1274 (quoting 15A C.J.S. Conflicts of Law § 31); *Roby v. Bailey*, 1993 OK CIV APP 93, 856 P.2d 1013, 1016 ("A choice of law question always involves choosing between the 'conflicting laws' of two or more states.").

[18] *Cates v. Integris Health, Inc.*, 412 P.3d 98, 103 (Okla. 2018).

[19] Okla. Stat. tit. 12A, § 2-102.

things . . . which are movable at the time of identification to the contract for sale . . . ."[20]
The Court finds that the Equipment is a "good," so the UCC governs.

"The UCC is to be liberally construed and applied to promote its underlying purposes and policies including the simplification, clarification and modernization of the law governing commercial transactions."[21] Unless specifically displaced by particular provisions of the Code, Courts are to look at the general statutes and caselaw of the state to supplement the UCC.[22] Additionally, due to the uniform nature of the UCC, decisions from other jurisdictions are "particularly persuasive," and Oklahoma courts frequently rely on them.[23] Indeed, where there is no Oklahoma decision on point, it is incumbent on the Court to consider decisions from other jurisdictions.[24]

### C.    Extrinsic evidence is competent to show that a contract never formed.

Cartessa argues that the Documents establish a fully integrated agreement, the terms of which may not be varied or contradicted by extrinsic evidence. In support of its argument, it directs the Court to the merger clauses found in the Documents, which provide in relevant part:

---

[20] *Id.* § 2-105.

[21] *Sesow v. Swearingen*, 552 P.2d 705, 707 (Okla. 1976) (footnote omitted); OKLA. STAT. tit. 12A, § 1-103.

[22] *Keota Mills & Elevator v. Gamble*, 243 P.3d 1156, 1161 (Okla. 2010) (discussing OKLA. STAT. tit. 12A, § 1-103).

[23] *Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1174 n.7 (10th Cir. 2008) (citing *Sesow*, 552 P.2d at 706).

[24] *See Nat'l Env't Serv. Co. v. Ronan Eng'g Co.*, 256 F.3d 995, 1004 (10th Cir. 2001) (discussing *Reynolds–Wilson Lumber Co. v. Peoples Nat'l Bank*, 699 P.2d 146, 149 (Okla. 1985)).

19.    ENTIRE AGREEMENT: The terms and conditions as set forth herein shall constitute the entire Agreement between [Lorents] and Cartessa. . . . This agreement supersedes any other agreement between Cartessa and [Lorents] in connection with the Products and services hereof. It cannot be modified, supplemented, or rescinded except by writing, duly signed and by the authorized signatures of both parties. . . . .[25]

Under the UCC, terms which are "set forth in a record intended by the parties as a final expression of their written agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement[.]"[26] A merger clause, however, does not conclusively prove that the parties intended a writing to be an integrated agreement.[27] Instead, it "creates a presumption that the writing represents an integrated . . . agreement of the parties[.]"[28]

---

[25] Cartessa Terms and Conditions of Sale (Dkt. 29-4), at 2, 4, 6, 8.

[26] OKLA. STAT. tit. 12A, § 2-202.

[27] *Summit Contractors, Inc. v. Legacy Corner*, L.L.C., 147 F. App'x 798, at *3 (10th Cir. 2005) ("Typically, merger clauses are strong evidence that the parties did not intend to include terms not expressly incorporated into the document containing the clause." (collecting cases)). The Court cites unpublished decisions of the Tenth Circuit for their persuasive value, consistent with Tenth Cir. R. 32.1 and Fed. R. App. P. 32.1.

*See also* Restatement (Second) of Contracts § 217 cmt. b ( "Even a 'merger' clause in the writing, explicitly negating oral terms, does not control the question whether there is an integrated agreement or the scope of the writing."); *see also, e.g.*, *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1024–25 (4th Cir. 1997) (quoting *Bowden v. United States*, 106 F.3d 433, 440 (D.C.Cir.1997)); *Enrico Farms, Inc. v. H. J. Heinz Co.*, 629 F.2d 1304, 1306 (9th Cir. 1980); *Bock v. Computer Assocs. Int'l, Inc.*, 257 F.3d 700, 707 (7th Cir. 2001).

[28] *Najera v. David Stanley Chevrolet, Inc.*, 406 P.3d 592, 597 n.2 (Okla. Civ. App. 2017) (internal quotation marks, emphasis, and alteration omitted) (quoting *Ritter v. Grady Auto. Grp., Inc.*, 973 So.2d 1058, 1062 (Ala. 2007)); Restatement (Second) of Contracts § 209(3) ("[A] writing which in view of its completeness and specificity reasonably appears to be a complete agreement . . . is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression."); *Id.* cmt. b ("Written contracts . . . may include an explicit declaration that there are no other agreements between

Because "a writing cannot prove its own completeness . . . generally, relevant extrinsic evidence may be considered to determine" whether the parties intended the writing to be an integrated agreement.[29] Thus, "wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties."[30]

Moreover, Lorents offers the extrinsic evidence for purposes of showing that the parties never entered into a contract in the first place. The parol evidence rule prevents a court from considering extrinsic evidence for purposes of contract interpretation, but it does not preclude evidence proffered to establish that a contract was never formed.[31] This is neither an exception to the parol evidence rule nor an infringement of it, because such

---

the parties, but such a declaration may not be conclusive."); *see also, e.g.*, *Becker v. HSA/Wexford Bancgroup, L.L.C.*, 157 F. Supp. 2d 1243, 1251 (D. Utah 2001) (applying Utah law) (citation omitted).

[29] 11 Williston on Contracts § 33:23 (4th ed.) (citing Restatement Second, Contracts § 210 cmt. b).

[30] Restatement (Second) of Contracts § 210 cmt. b.

[31] *Smith v. Vigortone Ag Prod., a Div. of Beatrice Foods Co.*, 978 F.2d 1268, at *2 n.2 (10th Cir. 1992) (citing *Coleman v. Holecek*, 542 F.2d 532, 535–36 (10th Cir.1976)); *Arnold Palmer Golf Co. v. Fuqua Indus., Inc.*, 541 F.2d 584, 588 (6th Cir. 1976) (collecting cases); *see also* 11 Williston on Contracts § 33:14 (4th ed.) (The parol evidence rule "does not preclude evidence which contradicts the very existence or validity of an alleged contractual obligation. Thus, the rule permits the admission of facts that negate mutuality of assent . . . . or that demonstrate the existence of a condition precedent to the contract or its obligations."); 6 Corbin on Contracts § 25.21 ("[T]he parol evidence rule does not bar the admission of parol evidence to prove that the writing, which purports to be a contract, is not a contract at all."); *Falcon Seaboard Gas Co. v. E. Am. Energy Corp.*, 45 F.3d 425, at *2 (4th Cir. 1995) (citation omitted); *People v. Kennedy*, 227 N.Y.S.2d 971, 972 (N.Y. App. Div. 1962) (Parol evidence is admissible "where the circumstances purport to show that the written instrument is in fact no contract at all." (citation omitted)); *Polygram Holding, Inc. v. Cafaro*, 839 N.Y.S.2d 493, 493–94 (N.Y. App. Div. 2007) ("[P]arol evidence may be offered "to show that a writing, although purporting to be a contract, is, in fact, no contract at all." (internal quotation marks and citation omitted)).

evidence "does not vary the terms of the writing but actually destroys it[.]"[32] Thus, evidence and inferences outside of the written words of the Documents can be considered in determining whether a contract was formed.

### D.    The UCC requires a meeting of the minds to form a contract.

Under the UCC, parties may enter into a contract for the sale of goods "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."[33] Even if some terms are left open, a contract will not fail for indefiniteness "*if the parties have intended to make a contract* and there is a reasonably certain basis for giving an appropriate remedy."[34] "Unless otherwise unambiguously indicated by the language or circumstances . . . an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of . . . goods[.]"[35]

---

[32] *Hartog v. Mehle*, 220 N.Y.S.2d 994, 997 (N.Y. App. Div. 1961).

[33] OKLA. STAT. tit. 12A, § 2-204.

[34] *Id.* (emphasis added).

[35] *Id.* §2-206.

There is no contract "unless both parties showed a 'meeting of the minds' in their intent to form one."[36] This is true whether the contract be written or oral.[37] The Tenth Circuit has held that the UCC (as adopted by Oklahoma) requires an examination of the parties' objective behavior to determine "whether there was mutuality of assent as manifested by the conduct of the parties."[38] Thus, intent must be ascertained "based solely on a reasonable interpretation of the written and oral communications between the two [parties], without regard to any unexpressed reservations."[39] These expressions "must be interpreted as they appear to a reasonable observer under the circumstances."[40] No singular act, phrase, or expression is to be disproportionately emphasized; instead, the totality of all the expressions must be viewed in light of "the attendant circumstances, the situation of the parties, and the objectives they were striving to attain."[41] The burden of proving that

---

[36] *Nat'l Env't*, 256 F.3d at 1002 (applying the UCC as adopted by Oklahoma); *Manchester Pipeline Corp. v. Peoples Nat. Gas. Co., a Div. of Internorth*, 862 F.2d 1439, 1445 (10th Cir. 1988) (applying the UCC as adopted by Oklahoma) (citing *Watkins v. Grady Cnty. Soil and Water Conservation Dist.*, 438 P.2d 491, 494 (Okla.1968)); *see also* 4A Vernon's Okla. Forms 2d, Com. & Consumer Forms § 2.3 ("It should always be kept in mind that the court must first find that the parties intended to enter into a binding agreement."); *Opals on Ice Lingerie v. Bodylines Inc.*, 320 F.3d 362, 372 (2d Cir. 2003) (A meeting of the minds of the parties is "the fundamental basis of a valid, enforceable contract[.]") (quoting *Schurr v. Austin Galleries of Ill.*, 719 F.2d 571, 576 (2d Cir.1983)).

[37] *Sarber v. Harris*, 368 P.2d 93, 96 (Okla. 1962).

[38] *Nat'l Env't*, 256 F.3d at 1002–03 (citation and internal quotation marks omitted); *see also Stonehill Cap. Mgmt., LLC v. Bank of the W.*, 28 N.Y.3d 439, 448–49 (N.Y. 2016) (citations omitted).

[39] *Nat'l Env't*, 256 F.3d at 1003.

[40] *Id.*

[41] *Stonehill*, 28 N.Y.3d at 448–49 (citation and internal quotation marks omitted).

there was a meeting of the minds rests on "the party alleging the existence of the contract."[42]

And although the UCC provides a more flexible approach to contracting, the traditional elements of offer and acceptance must be present.[43] "A manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent."[44] "'Reason to know' depends not only on the words or other conduct, but also on the circumstances, including previous communications of the parties and the usages of their community or line of business."[45]

---

[42] *See Fried v. Kelly*, No. 06CIV1528HB, 2007 WL 1821697, at *6 (S.D.N.Y. June 26, 2007), *aff'd*, 317 F. App'x 86 (2d Cir. 2009) (quoting *N.F.L. Ins. Ltd. v. B & B Holdings, Inc.*, 874 F.Supp. 606, 611 (S.D.N.Y.1995)).

[43] 4A Vernon's Okla. Forms 2d, Com. & Consumer Forms § 2.4; *see also, e.g.*, *Barker v. Allied Supermarket*, 596 P.2d 870, 872–73 (Okla. 1979) (applying the UCC as adopted by Oklahoma).

[44] *Manchester Pipeline*, 862 F.2d at 1443 n.5 (quoting Restatement (Second) of Contracts § 26) (applying the UCC as adopted by Oklahoma); *see also Schnabel*, 697 F.3d at 120 ("The conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." (internal quotation marks and alterations omitted) (quoting Restatement (Second) of Contracts § 19(2)).

[45] *Manchester Pipeline*, 862 F.2d at 1445 (internal quotation marks omitted) (quoting Restatement (Second) of Contracts § 26 (1979) cmt. a). Comment e of Section 26 of the Restatement (Second) of Contracts elaborates that even where an offeror submits a document to the offeree signed by the offeror, the signature on the document "is not conclusive where the other party has reason to know that no offer is intended."

"In Oklahoma, as under the law of most states, the question of the existence of a contract is a question of fact for the jury to resolve."[46] Specifically, when the existence of a contract depends on facts that are disputed, conflicting, or capable of differing inferences, the question is one for the jury.[47]

### E.    The parties' objective manifestations give rise to a genuine issue of material fact as to whether they intended to enter an agreement.

At the outset, the Court notes that the Documents themselves belie Cartessa's assertion that it made an offer to Lorents by sending him the Documents, which he accepted by signing. The "Cartessa Terms and Conditions of Sale" provide the following language:

> 1.    GENERAL: All Quotations, Sales Orders, *Purchase Agreements*, Products and Services provided by Seller, Cartessa Aesthetics, LLC (herein called Cartessa) are furnished only on the terms and conditions stated herein. All orders for any product Cartessa sells or distributes are subject to acceptance at Cartessa's office in Melville, New York. *Cartessa reserves the right to reject any purchase orders*.[48]

---

[46] *Manchester Pipeline,* 862 F.2d 1439, 1445 (collecting cases); *Gomes v. Hameed*, 184 P.3d 479, 485 (Okla. 2008) (collecting cases) ("The question of whether the minds of the parties ever met in complete agreement is a question of fact for the jury." (footnote omitted)); *see also, e.g.*, *Landsing Properties v. OKC Apartments, Ltd.*, 496 F. Supp. 5, 7 (W.D. Okla. 1979) (collecting cases); *Parsia, Inc. v. John E. Barbre Tr.*, 500 P.3d 667, 672 (Okla. Civ. App. 2021).

[47] *J. B. Klein Iron & Foundry Co. v. Midland Steel & Equip. Co.*, 83 P.2d 157, 159 (Okla. 1938) (collecting Oklahoma cases); *GRP of Texas, Inc. v. Eateries, Inc.*, 27 P.3d 95, 100 (Okla. 2001) (citation omitted); *Landsing Properties*, 496 F. Supp. at 7; 11 Williston on Contracts § 30:3 (4th ed.) ("When the existence of a contract is at issue and the evidence is either conflicting or admits of different possible inferences, the trial court should submit the question to the trier of fact."); *see also Kolchins v. Evolution Markets, Inc.*, 31 N.Y.3d 100, 106 (N.Y. 2018) (citation omitted).

[48] (Dkt. 29-4) at 2, 4, 6, 8 (emphasis added).

Thus, under their own terms, the signed Documents do not appear to have constituted an agreement, as they required a further act by Cartessa to make them binding.

The UCC contemplates purchase orders such as this one in Section 2-206: "[*u*]*nless otherwise unambiguously indicated by the language or circumstances* . . . an order or other offer to buy goods for prompt or current shipment shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of . . . goods[.]"[49] By retaining final acceptance authority and the right to reject the purchase orders, Cartessa did not give Lorents the legal power to create a contract with acceptance.[50] Thus, Cartessa may not have even made an offer to Lorents.[51] This must be determined by examining

---

[49] OKLA. STAT. tit. 12A, § 2-206 (emphasis added).

[50] "[A]n offer is an act on the part of one person whereby he gives to another the legal power of creating the obligation called contract. An acceptance is the exercise of that power." Where "some further act by a supposed offeror is necessary in order for a contract to take effect, there is as yet no offer." *Farago Advert., Inc. v. Hollinger Int'l, Inc.*, 157 F. Supp. 2d 252, 258 (S.D.N.Y. 2001) (internal quotation marks and alteration omitted) (quoting *Alleghany Corp. v. James Found. of N.Y., Inc.*, 115 F.Supp. 282, 299 n.29 (S.D.N.Y.1953)).

[51] In *Southwest Stationary & Bank Supply, Inc. v. Harris Corporation,* the buyer sent the seller a purchase order for a printing press, which provided that it was subject to final acceptance by the seller and unambiguously specified the proper method of acceptance. The Tenth Circuit held that where there was no such acceptance by the seller, there was no contract. 624 F.2d 168, 169–71 (10th Cir. 1980).

Other jurisdictions also consider such requirements for approval by the seller's home office to render written instruments quotes rather than offers. *See, e.g., Eureka Res., LLC v. Howden Roots LLC,* 553 F. Supp. 3d 233, 242 (M.D. Pa. 2021) ("Additionally, the inclusion of a 'home-office acceptance' clause generally prevents a proposal from constituting an offer."); *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 793 (2003) (where the purchase order "was qualified by statements that it was an 'invitation to offer only,' and that '[a]ny contract resulting from the quotation must be accepted at [the seller's c]orporate offices by a duly authorized representative of [the

evidence and inferences outside of the written words of the Documents to ascertain whether and, if so, to whom an offer was made.[52]

In accordance with Oklahoma law, because Lorents signed the Documents, the Court presumes that Lorents read the Documents and assented to their terms,[53] manifesting an intent to be bound. But the record contains evidence that a juror could conclude objectively indicated to Cartessa that Lorents did not intend to be bound or invite Cartessa's acceptance.

First, Lorents said that before he could entertain Lubin's offer, he had to look into financing due to his low cash flow and expressed that he wanted to obtain a Tulsa location before moving forward with the deal. Also, he demonstrated that he wished to negotiate the purchase price by stating that he thought $250,000.00 was a fairer price for the Equipment. Second, Swapp demonstrated that Cartessa was open to negotiating all of Lorents's terms as it primarily desired to make the deal happen. Swapp immediately followed this up by asking Lorents if he could send him a "quote" so that Cartessa could

---

seller,]" it did not "evidence an existing contract within the meaning of" the UCC as adopted by Massachusetts).

This, however, does not preclude contract formation as a matter of law. *See Crest Ridge Constr. Grp., Inc. v. Newcourt Inc.*, 78 F.3d 146, 150 (5th Cir. 1996)

[52] *See Sovereign Sales, L.L.C. v. N.Y. Accessory Grp., Inc.*, No. 03 CIV.3997(DC), 2005 WL 289577, at *1 (S.D.N.Y. Feb. 4, 2005) ("The issue of whether the quotation was an offer (or merely an invitation to offer) is a factual inquiry into the intent of the contracting parties, to be resolved based on objective manifestations of intent.")

[53] *Hardrick v. David Stanley Dodge, LLC*, No. CIV-15-540-C, 2015 WL 13573979, at *2 (W.D. Okla. June 4, 2015) (quoting *Mayfield v. Fid. State Bank of Cleveland*, 249 P. 136 (Okla. 1926)).

"generate [a] proforma invoice[.]" These facts, especially when taken in conjunction with Cartessa's reservation of the right of final acceptance in the Documents, show that Cartessa did not yet intend to be bound. Finally, the parties appear to have been in the early stages of negotiations. All of these attendant circumstances would have demonstrated to Cartessa that Lorents did not intend to make an offer by executing the Documents. Thus, they tend to show that Lorents's signature wasn't manifestation of assent.

After Lorents executed the Documents, Cartessa manifested an intent to be bound by promptly commencing performance. However, Lorents showed that he did not intend to be bound by asking Cartessa to cease delivery on the same day that he received the first two pieces of the Equipment.[54] One could interpret the ongoing negotiations before and after Lorents had received notice of Cartessa's performance as manifesting Lorents's intent to be bound, but these competing inferences are for a jury, not the Court, to decide.[55]

---

[54] The record indicates that Lorents never even opened the boxes that he did receive. Text message exchange between Jon Banks (Cartessa's Chief Financial Officer) and Lorents (Dkt. 29-27), at 2.

[55] Additionally, the record indicates that any agreement may have been subject to a condition precedent—the procurement of financing that Lorents approved. This too is a question of fact. *See, e.g.*, *Calbag Metals Co. v. Guy F. Atkinson Co.*, 770 P.2d 600, 601 ( Or. Ct. App. 1989) (applying UCC as adopted by Oregon) (It is a question for the jury whether the parties intended to enter an agreement or whether that agreement was subject to a condition precedent that was satisfied); *Harding v. Capitol Fed. Sav. Bank*, 556 P.3d 910, 919 (Kan. Ct. App. 2024) ("Whether contractual performance is based on a condition precedent is a question of fact." (alteration omitted)); *Rogers v. Jackson*, 804 A.2d 379, 382 (Me. 2002) (Where evidence of an oral condition supplements but does not contradict the writing, proof of it is not barred by the parol evidence rule, and the existence of such a condition is a question of fact.).

A genuine issue of material fact exists as to whether Lorents objectively manifested an intent to be bound by the Documents. Thus, summary judgment for either party is inappropriate on Cartessa's breach of contract claim. The Court therefore **DENIES** the motions (Dkts. 29, 34) to the extent that they seek summary judgment on Cartessa's breach of contract claim.

## II. There is a fact issue as to whether Cartessa is a lost volume seller.

Next, Lorents moves the Court to find as a matter of law that, if there is a contract between the parties, Cartessa is not entitled to recover the entire contract price. In response, Cartessa contends that it is a "lost volume" seller, entitled to the profit it would have enjoyed had Lorents paid the full purchase price. Lorents did not file a reply.

Generally, under the UCC, a seller is entitled to recover damages for breach of contract measured by damages for nonacceptance under Section 2-708.[56] Section 2-708 provides two measures for a seller's damages for non-acceptance or repudiation by the buyer: (1) "the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages . . . , but less expenses saved in consequence of the buyer's breach"; or if such damages are "inadequate to put the seller in as good a position as performance would have done" (2) "the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages . . . , due allowance for costs reasonably incurred and due credit for payments or proceeds of resale."

---

[56] OKLA. STAT. tit. 12A, § 2-703.

The second measure "is basically designed for specific categories of sellers, such as lost volume sellers[.]"[57] "A lost volume seller is one who has the capacity to perform the contract which was breached as well as other potential contracts, due to their unlimited resources or production capacity."[58] Whether a seller is a lost volume seller is a "decision dictated by the underlying facts and thus ultimately a question of fact . . . ."[59] Sellers have the burden of proving that they are lost volume sellers.[60]

Cartessa relies on the sworn affidavit of its Chief Financial Officer, Jon Banks, in which Mr. Banks testifies that Cartessa has an unlimited supply of the products contemplated by the documents, as it purchases them from manufacturers and resells them to buyers. "As a matter of practice and custom, Cartessa is always replenishing its stock so it is always able to fulfill orders[.]"[61] Thus, Mr. Banks attests that "Cartessa intended to and was capable of selling" the products that it intended to sell to Lorents "to another purchaser without incurring additional expenses or overhead."[62] Mr. Banks asserts that, had Lorents fully performed, Cartessa's profits would have been $227,320.00.

Although Lorents did not file a reply brief, he addressed Mr. Banks's affidavit in his Response to Cartessa's Motion. However, he only attacks Mr. Banks's figure for the

---

[57] *Bill's Coal Co. v. Bd. of Pub. Utilities of Springfield, Mo.*, 887 F.2d 242, 245 (10th Cir. 1989).

[58] *Id.*

[59] *Id.*

[60] *Id.* (collecting cases).

[61] Aff. of Jon Banks (Dkt. 33-1), ¶ 33.

[62] *Id.* ¶ 34.

lost profits as conclusory. He does not meaningfully dispute that Cartessa did in fact suffer damages in the form of lost profits. Based on the record evidence, a reasonable juror could conclude that Cartessa is a lost volume seller, entitled to recover damages for lost profits under Section 2-708(2). Accordingly, summary judgment is inappropriate as to this issue.

## III.    A ruling on Lorents's affirmative defenses and counterclaim is premature.

Cartessa also seeks summary judgment on Lorents's affirmative defenses and counterclaim for fraud in the inducement. But because there is a preliminary fact issue as to whether the parties entered into a contract in the first place, it would be imprudent to consider the merits of Lorents's proffered affirmative defenses to that breach of contract claim. Similarly, the injury in Lorents's fraud claim (contractual obligations that he would not have otherwise incurred but for his reliance on Swapp's representations) hangs on whether Cartessa fraudulently induced him to enter into a contract in the first place. Thus, the Court denies Cartessa's Motion as it pertains to Lorents's affirmative defenses and counterclaim.

### Conclusion

For the reasons given above, the Court **DENIES** the motions (Dkts. 29, 34).

**IT IS SO ORDERED** this 9th day of December 2024.


_____
PATRICK R. WYRICK
UNITED STATES DISTRICT JUDGE